William **KREGLER**, Plaintiff,

v.

**CITY OF NEW YORK**
et al., Defendants.

No. 08 Civ. 6893 (VM).

United States District Court,
S.D. New York.

March 16, 2009.

Nathaniel B. Smith, Law Office of Nathaniel B. Smith, New York, NY, for Plaintiff.

Christopher Aaron Seacord, New York City Law Department, New York, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff William Kregler ("Kregler") brought this action pursuant to 42 U.S.C. § 1983 (" § 1983") alleging that defendants violated his rights under the First and Fourteenth Amendments of the United States Constitution. Defendants consist of the City of New York (the "City") and five individuals who at all relevant times were employees of the City's Fire Department ("FDNY") or Department of Investigation ("DOI") (collectively with the City, "Defendants"). Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss the amended complaint for failure to state a claim upon which relief can be granted. For the reasons stated below, the Court defers decision on the motion pending the outcome of a preliminary hearing it will conduct pursuant to Federal Rule of Civil Procedure 12(i) ("Rule 12(i)").

## I. INTRODUCTION

This case raises a longstanding concern frequently noted by the Supreme Court and the Second Circuit, as well as by federal courts across the country. Not uncommonly, on the basis of nothing more than the barest conclusory allegations, government officials are summoned to court to defend private lawsuits charging constitutional violations and other serious official misconduct. In most cases the costs the parties incur in litigation such actions, measured by expenditures of time and public resources, disruption of government operations, and potential damage to professional and personal reputations, are quite extensive. Frequent instances arise in which the underlying issues raise matters involving the formulation of government policy or, as in the case at hand, the appointment of public officers. These circumstances may implicate inquiry into confidential communications, though processes and internal documents containing sensitive matters the public disclosure of which in itself could entail judicial proceedings. Equally significant are the attendant impacts of such lawsuits on the courts' dockets and the administration of justice. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("[I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.").

More fundamentally, the question regarding the personal and social costs associated with litigating insubstantial lawsuits reduces to a far greater value: fairness. It is inequitable to subject a government official—or indeed any party—to the burdens of defending a claim challenged on legitimate grounds as insubstantial or frivolous for any longer than the minimum time reasonably necessary to ascertain whether sufficient basis exists to warrant allowing the action to proceed. For essentially the same social costs and fairness considerations, our justice system prescribes speedy trial rules demanding the earliest feasible resolution of charges against defendants in criminal cases.

The consequences described above, however, are not always, and not necessarily, of the complainant's making. Rather, to a large degree they reflect unintended side effects, by-products of the lenient notice pleading standards embodied in Federal Rules of Civil Procedure 8(a) ("Rule 8(a)") and 12(b)(6) and related case law. These rules are designed to insure that litigants with meritorious claims obtain adequate access to resolve their disputes in court. But, in a judicial instance of the duality that generally pervades so much of life, the same open door that welcomes the just cause also admits the nuisance suit; the flimsy or frivolous allegation is as free to enter the courthouse as the valid claim. As the Supreme Court has recognized, accusations of unconstitutional conduct on the part of public officials are easy to level, but very difficult and costly to defend against. *See Crawford–El v. Britton,* 523 U.S. 574, 584–85, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (noting "a potentially serious problem" that the District of Columbia Circuit had sought to address: "Because an official's state of mind is 'easy to allege and hard to disprove,' insubstantial claims that turn on improper intent may be less amenable to summary disposition than other types of claims against government officials.") (citation omitted); *Tenney v. Brandhove,* 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) ("In times of political passions, dishonest or vindictive motives are readily attributed to [government official] conduct and as readily believed.").

Over the course of many years courts concerned with the severe hardships that insubstantial lawsuits place on litigants, on the justice system and on society as a whole have struggled with this dilemma, not only as it pertains to complaints lodged against government officials, but to litigation in general. To address these issues, courts have devised several tests meant both to instruct plaintiffs on drafting well-pleaded claims, and to guide the courts' review of the legal sufficiency of claims for relief. Among such judicial means employed to part the wheat from the chaff are: imposing "heightened" pleading standards, discounting conclusory allegations, rejecting recitations of law and factually unsupported incantations of the statutory or common law elements of a cause of action. Yet, as the case at hand illustrates and the law reports amply record, the problem persists, a sign of an intrinsic tension built into the federal rules. The Supreme Court has repeatedly rejected the notion that the Federal Rules of Civil Procedure countenance any universal heightened pleading standard, and has consistently reaffirmed that Rule 8(a) calls for nothing more than what its clear text prescribes: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *see also Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). Moreover, whether in their factual allegations as originally crafted, or upon being granted leave to replead deficient claims, seasoned plaintiffs' counsel know to charge the pleadings with enough adjectives that reverberate of extreme malice, improper motives, and bad faith to raise factual issues sufficient to survive a dispositive motion, thus securing a hold on the defendant strong enough for the duration, however long and costly the ultimate resolution of the claim may be.

In practical terms, the philosophy of pleading that these rules embodies, a one-rule-fits-all principle, defines the scope of

the problem engendered by its unintended outcomes. For instance, in theory the same generalized minimal Rule 8(a) standards that govern the plaintiff's drafting, as well as the court's review, of a complaint alleging common law negligence stemming from a slip and fall, or a breach of a simple contract for failure to pay a debt, apply to writing and evaluating a complaint charging civil violations of intricate federal antitrust, intellectual property, or racketeering statutes. Similarly, the bare bones essence of a claim that is necessary to survive a motion to dismiss is the same whether the complaint is authored by John Dioguardi or by Wall Street lawyers. *See Dioguardi v. Durning,* 139 F.2d 774 (2d Cir.1944).

To be sure, the federal rules include provisions designed to ensure that factual allegations in pleadings have some evidentiary and legal support and are made in good faith, as well as sanctions to deter abusive practices. Specifically, Federal Rule of Civil Procedure 11 ("Rule 11") deems any litigation papers submitted to the court as embodying a certification that, to the person's knowledge, information and belief, "formed after an inquiry reasonable under the circumstances," the filing is not presented for an improper purpose, the claims are warranted by law, and the factual allegations have or will likely have evidentiary support. Fed. R. Civ. P. 11(b)(1)-(3). But these rules are difficult to police effectively, and, under the rigorous bar that governs imposition of Rule 11 sanctions, they are infrequently invoked and only rarely enforced.

These considerations serve as a backdrop for the Court's review of Defendants' motion to dismiss the complaint in this case. Below, the Court outlines a procedure it will employ to reach a resolution it deems appropriate to do substantial justice for the parties and to promote judicial economy as expeditiously as possible. The Court regards the means proposed, if somewhat uncommon, nonetheless permissible under the federal rules and applicable case law.

## II. *FACTS*

Until his retirement in March 2004, Kregler had been employed by the FDNY for 20 years. One month after retiring, Kregler filed a preliminary application for appointment by the Mayor as a City Marshal, a process governed by Article 16 of the New York City Civil Court Act. *See* N.Y. City Civil Ct. Act § 1601(1) (" § 1601"). Pursuant to § 1601 and the Mayor's Executive Order 44 ("Executive Order 44"), the Mayor's Committee on City Marshals (the "Mayor's Committee") is charged with recruiting and recommending candidates for appointment as City Marshals. Candidates are subject to a DOI investigation of personal and financial background, and to a training program administered by DOI. In January 2005 Kregler was interviewed by representatives of the Mayor's Committee and was later notified by defendant Keith Schwam ("Schwam"), an Assistant Commissioner at DOI, that DOI would commence its personal and financial review of Kregler's background. As a follow-up, Kregler met in April 2005 with defendant Darren Keenaghan ("Keenaghan"), a DOI investigator, to discuss Kregler's preliminary application. Kregler then made minor modifications, signed the revised application, and provided authorizations for release of personal information.

On May 25, 2005 Kregler, in his capacity as President of the Fire Marshals Benevolent Association ("FMBA"), an organization of the FDNY Fire Marshals, publicly endorsed the candidacy of Robert Morgenthau ("Morgenthau") for reelection as District Attorney for New York County. Kregler asserts that at that time all other

law enforcement associations, including the two other unions of firefighters, supported Morgenthau's opponent, Leslie Crocker Snyder ("Snyder"). An article that appeared in a June 2005 edition of *The Chief,* a local newspaper, reported on the endorsement of Morgenthau by Kregler acting as president of the FMBA. According to Kregler, defendant Brian Grogan ("Grogan"), an FDNY Supervising Fire Marshal, posted a copy of that article in a public area within one of the FDNY offices. Kregler further alleges that Grogan "berated" him for the endorsement, stating: "who the f... do you think you are. Louie [Garcia] makes the endorsements." (Amended Complaint ("Compl.") ¶ 28.) Defendant Louis Garcia ("Garcia") was Chief Fire Marshal of the FDNY's Bureau of Fire Investigation. Kregler alleges that both Garcia and Kregler politically supported Snyder's campaign against Morgenthau, that Garcia was socially acquainted with defendant Rose Gill Hearn ("Hearn"), the DOI Commissioner, and that Hearn also politically supported Snyder's candidacy.

On July 7, 2005, Kregler was interviewed by staff of the Mayor's Office in connection with his Fire Marshal application and the following day was told by Schwam that the next step in the process would be the completion of the DOI background check. To that end he met a second time with Keenaghan to update and refile his application. In September 2005 Kregler and four other candidates began the DOI training classes, which Kregler states he successfully completed in October 2005. Kregler describes the training program as consisting of "about 30 hours of classroom lectures, extensive homework, a final examination, field trips to court houses, and working with existing City Marshals in the course of their regular duties." (Compl. ¶ 34.) In November 2005 [1] Kregler satisfied the last requirement for appointment by demonstrating his ability to obtain a bond.

Morgenthau was reelected as District Attorney in November 2005. In March 2006 Kregler was informed by letter from Schwam that he would not be appointed as a Fire Marshal. He filed this action in August 2008 alleging that Garcia and Hearn "agreed to cause Kregler's application for appointment as a City Marshal to be rejected in retaliation for Kregler's support of Morgenthau." (Comp. ¶ 41.) He further asserts that Garcia and Grogan and other FDNY employees requested Hearn, Schwam, Keenaghan, and other DOI employees to misuse their authority to cause the rejection of his application. Responding to the reason Defendants proffered for denying him an appointment—his failure to disclose details of a command discipline he had received in 1999 during his employment by the FDNY—Kregler states that this explanation is merely a pretext for Defendants' unlawful retaliation.

### III. *DISCUSSION*

■ Defendants argue that Kregler's complaint must be dismissed because his pleadings fail to satisfy the elements of an action for First Amendment retaliation under § 1983. To state a such claim, a plaintiff must demonstrate that (1) he engaged in constitutionally protected speech, (2) suffered an adverse employment action, and (3) a causal connection exists between the speech and the adverse employment action "so that it can be said that the speech was a motivating factor in the determination." *Washington v. County of*

---

1. The Amended Complaint states that Kregler satisfied this requirement in November 2006. (*See* Compl. ¶ 36.) This statement may reflect a typographical error because Kregler's application was denied in March 2006.

*Rockland,* 373 F.3d 310, 320 (2d Cir.2004) (*citing Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)). Defendants contend that even assuming, for the purposes of this motion, that Kregler engaged in protected speech and suffered an adverse employment action, he has not stated factual allegations sufficient to support a reasonable finding of a causal connection between his endorsement of Morgenthau's candidacy and Defendants' decision not to offer Kregler a position as City Marshal. Defendants also maintain that Kregler fails to assert retaliatory animus or personal involvement by Defendants in the decision not to appoint Kregler, and thus that he fails to satisfy the third element of a First Amendment retaliation claim.

■ A plaintiff may satisfy the element of causal connection between the alleged protected speech and the adverse employment action "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment ... or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). Kregler's only allegation connecting his protected speech and the retaliation he claims is that Grogan "berated" him on account of Kregler's public endorsement of Morgenthau, stating, "among other things," that it was Garcia who made public endorsements. (Compl. ¶ 28.) Defendants argue that Grogan's reaction manifests nothing more than his anger that Kregler had stepped out of bounds by performing an FMBA function that properly belonged to Garcia. Interpreting Kregler's assertion in the light most favorable to him, and without a factual record of what "other things" Grogan may have said to Kregler on that occasion, the Court cannot determine to what extent Grogan may have harbored retaliatory animus beyond that which may have been conveyed by the one remark Kregler specifies.

A more fundamental issue touching upon the sufficiency of Kregler's retaliation claim is that nothing in the record indicates that Grogan or Garcia made the decision to deny Kregler a City Marshal appointment, or had any direct personal involvement in the matter. Under § 1601 the final determination not to offer Kregler a position was presumably made by the Mayor's Committee upon the recommendation of DOI officials. A basic premise of Kregler's claim is therefore that, for retaliatory reasons arising from Kregler's endorsement of Morgenthau, Grogan and Garcia communicated and agreed with DOI employees to interfere with Kregler's application, and that Hearn and other DOI officials then influenced representatives of the Mayor's Committee and the Mayor's Office to prevent Kregler's appointment. Kregler does not allege that Schwam, Keenaghan, Hearn, or any other DOI officials had any direct knowledge of his endorsement of Morgenthau. He thus grounds his theory of retaliation on suggestion supported by a chain of inferential links that would connect the alleged improper political motives of the FDNY officials he names with the actions of the officials at DOI.

Defendants argue that, at its core, Kregler's action amounts to a claim of conspiracy to violate his constitutional rights. According to Defendants, Kregler developed his alleged conspiracy theory to overcome the dilemma that the FDNY officials he claims had political motives to oppose his City Marshal application were not the persons in DOI or the Mayor's Committee who actually made the decision not to offer him an appointment. Faced with this legal impediment, Kregler alleges that first Garcia and Grogan and then Garcia and Hearn "agreed to take steps to interfere with and prevent Kregler's appointment," (Compl. ¶ 40), and that Garcia and Hearn "agreed" to cause Kregler's application for appoint-

ment as a City Marshal to be rejected by DOI in retaliation for Kregler's support of Morgenthau (*id.* ¶ 41). Reading Kregler's pleadings as asserting a conspiracy claim, Defendants contend that under Second Circuit law a heightened pleading standard governs such actions, pursuant to which specific facts tending to demonstrate that a "meeting of the minds" occurred must be pleaded, rather than bare conclusory allegations that an agreement was reached. (Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, dated December 2, 2008, at 13) (*citing Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)).

In response, Kregler points out that his complaint does not allege any conspiracy claim, and that in any event recent Supreme Court decisions have rejected the existence of any general heightened pleading standard. Instead, Kregler asserts that the applicable test by which to assess the sufficiency of his complaint is the short and plain statement of the claim called for under Rule 8(a)(2), which requires that the pleadings need only give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 513, 122 S.Ct. 992. With regard to the standard governing review of Rule 12(b)(6) motions to dismiss, Kregler points to authority declaring that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. NYC Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Surprisingly, in squaring off their conflicting stands on the proper standard of review, the parties use as foils the test of a "heightened pleading standard" pointed against the language of "no set of facts."

But neither of them mentions either of two recent cases that essentially dispatched those phrases from our procedural law as general pleading guides: *Twombly,* now the most relevant Supreme Court decision articulating the applicable test to evaluate Rule 12(b)(6) motions to dismiss for failure to state a claim, and *Iqbal,* the Second Circuit's reading and application of *Twombly.* In *Twombly,* an antitrust case, the Supreme Court, though reiterating the traditional liberal tests pertaining to pleading under Rule 8(a) and to reviewing motions to dismiss under Rule 12(b)(6), nonetheless gave *Conley's* "no set of facts" formula a decent burial, and somewhat modified the traditional notice pleadings standard. *See Twombly,* 550 U.S. at 563, 127 S.Ct. 1955 (declaring that *Conley's* "no set of facts" language "has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard"). The *Twombly* Court then stated that to be sufficient under Rule 8(a) and survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must be "enough to raise a right to relief above the speculative level," *id.* at 555, 127 S.Ct. 1955, and state a claim "plausible on its face," *id.* at 570, 127 S.Ct. 1955.

Explaining *Twombly* in the context of a defense invoking qualified immunity, the Second Circuit in *Iqbal* concluded that the Supreme Court had not recognized a universal standard of heightened fact pleading, but instead required "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" 490 F.3d at 157–58 (emphasis in original). In applying the *Twombly* standard to the facts of the case before it, the *Iqbal* Court noted that some of the plaintiff's claims were based on generalized allegations of supervisory involvement rather than on facts supporting the claim. It

concluded that to survive a motion to dismiss under *Twombly*'s plausibility standard "a conclusionary allegation concerning some elements of a plaintiff's claims might need to be fleshed out." *Id.* at 158.

Running through *Twombly* and *Iqbal* is a common theme that has long troubled the courts: the tension between, on the one hand, the lenient notice pleading standards embodied in Rules 8(a) and 12(b)(6) to ensure that plaintiffs with meritorious claims have maximum access to the courts, and on the other hand the imperative to "weed out" groundless actions early in the litigation so as to minimize the expenditure of time and resources of the parties and the courts. *See Twombly,* 550 U.S. at 557–60, 127 S.Ct. 1955; *see also Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (noting the importance of a pleading standard requiring something more than a mere possibility of loss causation lest "a plaintiff with 'a largely groundless claim'" be allowed to "'take up the time of a number of other people with the right to do so representing an *in terrorem* increment of the settlement value'") (*quoting Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)).

These cases underscore various rationales to justify a pleading standard which requires factual allegations that rise above the traditional Rule 8(a) notice pleading standard and that cross into the realm of "plausibility." In *Twombly,* the Supreme Court stressed the need to "avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a claim. *Id.* 550 U.S. at 559–60, 127 S.Ct. 1955. (*quoting Dura Pharms.,* 544 U.S. at 347, 125 S.Ct. 1627) (alteration in original). Other cases addressing these concerns have focused not just on the expense of litigation, but on the burdens that bare allegations of misconduct, especially those charging malice or other wrongful intent, place on government officials, and on the need to "protect officials from the costs of 'broad-reaching' discovery." *Crawford–El,* 523 U.S. at 584, 118 S.Ct. 1584 (*citing Harlow,* 457 U.S. at 818, 102 S.Ct. 2727); *see also Harlow,* 457 U.S. at 817–18, 102 S.Ct. 2727 (declaring that "bare allegations of malice should not suffice to subject government officials to either the costs of trial or to the burdens of broad-reaching discovery").

Concern over the effects of sketchy, generalized claims of misconduct brought against government officials underlies the Second Circuit's reading in *Iqbal* of *Twombly*'s "plausibility standard." There the Circuit Court noted that "qualified immunity is a privilege that is essential to the ability of government officials to carry out their public roles effectively without fear of undue harassment by litigation." 490 F.3d at 158. The court recognized that without some "countervailing discovery safeguards" of the pleadings with factual allegations to render a claim plausible, "Rule 8(a)'s liberal pleading requirement ... threatens to create a dilemma between adhering to the Federal Rules and abiding by the principle that qualified immunity is an immunity from suit as well as from liability." *Id.* at 159.

To address considerations regarding the costs that insubstantial litigation imposes on the parties and its adverse effects on government administration, the Supreme Court and Second Circuit, while rejecting the imposition of a universal heightened pleading standard, have recognized that a district court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *see also Car Carri-*

*ers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984) (noting in an antitrust case that the costs of federal litigation and the increasing case load of federal courts "counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"). Specifically, the courts have devised several rules and offered guidance suggesting other means to "weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168–69, 113 S.Ct. 1160. In *Twombly,* the Supreme Court formulated its plausibility standard. In *Crawford–El,* it suggested that before allowing discovery to proceed, a court could apply Federal Rule of Civil Procedure 7(a) to order a reply to the defendant's answer, or Rule 12(e) to require a more definite statement. By these means, the courts could seek to ensure that the plaintiff "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment." 523 U.S. at 598, 118 S.Ct. 1584 (citation omitted). The Supreme Court further advised that if the action survives these initial hurdles, entitling the plaintiff to some discovery, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Id.*

In *Iqbal,* the Second Circuit expanded upon this guidance. It suggested that "amplification" of factual allegations to survive a motion to dismiss under *Twombly*'s plausibility standard may be required in response to a defendant's motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(b). 490 F.3d at 158. In addition, the Circuit Court counseled that a district court consider "exercising its discretion to permit some limited and tightly controlled reciprocal discovery so that a defendant may probe for amplification of a plaintiff's claims and a plaintiff may probe such matters as a defendant's knowledge of relevant facts and personal involvement in challenged conduct." *Id.* The Circuit Court added that the district court could structure such limited discovery by examining responses to written interrogatories and requests to admit before authorizing depositions. *See id.*

These suggestions, though perhaps suitable and practical in some circumstances, may not achieve their intended benefits in others. Callino for more definite statements under Rule 12 may be taken as an invitation for additional motion practice. Authorizing reciprocal discovery, however tightly controlled, raises the reality recognized by the Supreme Court in *Twombly* that even the most careful case management may not suffice to weed out groundless claims early in discovery "given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." 550 U.S. at 559, 127 S.Ct. 1955 (*citing* Easterbrook, *Discovery as Abuse,* 69 B.U.L.Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves.")). Moreover, in many cases, for the parties and the court to wait until the completion of discovery and rely on a summary judgment motion to dispose of an unmeritorious claim would essentially moot any effort to mitigate the concerns expressed above, and in fact would enable the occurrence of precisely the ill-effects the courts have been grappling to avoid.

The instant litigation raises many of those issues and concerns. It entails serious charges of constitutional violations and abuse of power allegedly committed for political purposes by high officials of the City's FDNY and DOI, including the DOI

Commissioner. Defendants' filed a pre-answer motion to dismiss the original complaint. To streamline the allegation and minimize motion practice the Court scheduled an early conference prior to Kregler filing any response. The Court concurred with Defendants objections that, as pled, the original complaint contained certain deficiencies, particularly in asserting a conspiracy count pursuant to 42 U.S.C. § 1985(3), and in inadequately pleading personal involvement by Defendants in Kregler's § 1983 claim. In response, Kregler filed an Amended Complaint that removed the § 1985(3) claim, but nonetheless invited a renewed motion to dismiss. Defendants contend that while the Amended Complaint dropped the § 1985(3) conspiracy claim, it essentially reintroduces a conspiracy theory through a backdoor in Kregler's reformulated § 1983 claim. Defendants point to a renewed conspiracy claim in Kregler's allegations that Defendants discussed Kregler's application for appointment as a City Marshal and "agreed" to prevent him from obtaining the position for improper motives that violated Kregler's constitutional rights.

The Court finds that under *Twombly*'s plausibility standard Kregler's amended complaint remains at best borderline in stating a First Amendment retaliation claim. To survive the new motion to dismiss the pleadings as modified would require the Court to accept as true numerous conclusory allegations, to make substantial inferential leaps, and to resolve considerable doubts in Kregler's favor. For example, Kregler does not allege that Hearn had any direct knowledge of his endorsement of Morgenthau. Thus, the plausibility of Kregler's retaliation claim may turn on this vital link in the causal chain. It would require finding that because Garcia and Hearn were "personally and socially acquainted" (Compl. ¶ 39), and that allegedly they both supported Snyder, then by infer-ence, Garcia used his contacts with Hearn improperly to influence her determination on Kregler's application, and that Hearn and Garcia then agreed to cause Kregler's appointment to be rejected by DOI in retaliation for Kregler's support of Morgenthau.

Moreover, the Court would need to stretch the temporal and causal connection between the alleged protected activity and the adverse action at issue. Kregler's endorsement of Morgenthau occurred in May 2005, but he was notified about the denial of his application in March 2006. During the intervening time, he was permitted to proceed with all of the steps involved in the appointment procedure, including interviews with representatives of the Mayor's Office at City Hall, further interviews with Keenaghan and filing new application forms, a full investigation by DOI, completion in September 2005 of an extensive training course, and demonstration of his ability to obtain the required bond. There is authority holding that a lapse of time of as much as the nine months in question here may be too long to support a reasonable finding of a connection between the protected activity and the alleged retaliatory act. *See, e.g., Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554–55 & n. 5 (2d Cir.2001). Accordingly, to state a plausible retaliation claim Kregler would need to flesh out his conclusory allegations with a factual showing supporting his assertion that such a causal connection exists.

Perhaps not cognizant of the gloss *Twombly* added to the Rule 8(a) pleading standard, Kregler simply points the Court to the traditional "no set of facts" standard that governed review of motions to dismiss under *Conley*: that factual allegations in the complaint are presumed to be true; that all reasonable inferences must be drawn and doubts resolved in the plain-

tiff's favor; that these standards apply with particular strictness as regards complaints of civil rights violations; and that an inquiry as to the factual issue of causation addresses the quality of the evidence and is thus more appropriate on a motion for summary judgment rather than on the basis of the pleadings. This argument overlooks that *Twombly*'s intent, as read by the Second Circuit, was "to make some alteration in the regime of pure notice pleading that had prevailed in the federal courts ever since *Conley v. Gibson.*" *Iqbal,* 490 F.3d at 155. Nonetheless, the Court is mindful of the traditional standards insofar as they survive *Twombly,* and also of other strictures that limit judicial authority to dismiss a complaint pursuant to Rule 12(b)(6). *See, e.g., Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 (instructing that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely'") (*quoting Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■ Weighing the considerations described above, and acknowledging that this case presents a close call, to minimize additional motion practice at this stage and avert potentially unnecessary extensive discovery, the Court proposes two steps intended to achieve the "amplication" of factual allegations by means of a "flesh[ing] out" procedure such as that suggested in *Iqbal.* 490 F.3d at 158. First, the Court will exercise its discretion pursuant to Rule 12(i) to schedule a preliminary hearing at which the parties may present the testimony of live witnesses and other evidence limited to Defendants' objections to the pleadings, specifically the threshold legal issues upon which, under the *Twombly* and *Iqbal* plausibility test, the sufficiency of Kregler's retaliation claim is grounded. Second, the hearing would serve as an occasion for the Court to probe, in accordance with Rule 11(b), the extent to which some of Kregler's conclusory allegations have factual support and were formed after an inquiry reasonable under the circumstances.

■ Rule 12(i) authorizes the Court to conduct a preliminary hearing to consider and decide before trial a motion raising any defense listed in Rule 12(b)(1)-(7). *See* Fed.R.Civ.P. 12(i). As appropriate, the Court may use that procedure to determine jurisdictional as well as other threshold issues. *See Rivera–Gomez v. de Castro,* 900 F.2d 1, 2 (1st Cir.1990) (noting that Rule 12(i) "can be an excellent device for conserving time, expense, and scarce judicial resources by targeting early resolution of threshold issues"); *Cruz v. Sullivan,* 802 F.Supp. 1015, 1016–17 (S.D.N.Y. 1992). The Court may order such a hearing on motion or sua sponte. *See Rivera–Gomez,* 900 F.2d at 2. As regards matters involving factual issues that bear on the subject of the hearing the Court may consider affidavits, depositions or documents, or testimony presented orally. *See Unicon Mgmt. Corp. v. Koppers Co.,* 38 F.R.D. 474, 476–77 (S.D.N.Y.1965), *aff'd,* 366 F.2d 199 (2d Cir.1966). However, this procedure cannot be employed to decide the merits of a dispute, or issues so closely interwoven with the merits so as to render it unlikely or impractical that the hearing would achieve a productive outcome. *See United States v. Montreal Trust Co.,* 358 F.2d 239 (2d Cir.1966), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 456 F.2d 326 (5th Cir.), *rev'd on other grounds,* 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); *see generally* 5C Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1373 at 278–90 (3d ed. 2004).

The Court finds that employment of this procedure is particularly fitting to achieve

early resolution of certain threshold issues in this case. The action involves serious accusations of violations of constitutional rights brought against public officials. The Supreme Court and the Second Circuit have instructed district courts to exercise their broad discretion to guard public officials from being "subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford–El,* 523 U.S. at 597–98, 118 S.Ct. 1584; *Harlow,* 457 U.S. at 817–18, 102 S.Ct. 2727 (stating that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery"); *Iqbal,* 490 F.3d at 159. Although these cases were decided in connection with defenses asserting qualified immunity, as the Supreme Court made clear in *Twombly* the underlying concerns over insubstantial or frivolous lawsuits could apply with no less force in the context of certain other litigation as well. In fact, the effects of such actions may be compounded in cases charging abuse or power, dereliction or duty for political purposes, and other serious accusations of unconstitutional conduct by government officials where qualified immunity may not apply, or the defendant chooses not to invoke it.

Here, the Court, in response to Defendants' original motion to dismiss, has already accorded Kregler an opportunity to amend his complaint. The revised pleadings made only marginal changes to address Defendants' first set of objections to Kregler's conspiracy theory, thereby giving rise to a renewed motion to dismiss. The sufficiency of the amended pleadings, and hence whether the complaint now satisfies *Twombly*'s test of plausibility, depends upon whether Kregler ultimately can make out a prima facie case of First Amendment retaliation. Resolution of this question in turn rests upon certain threshold issues raised by the objections stated in Defendants' motion: the extent of Defendants' personal involvement in the decision to deny Kregler an offer of an appointment as a City Marshal, and the existence of a causal connection between Kregler's endorsement of Morgenthau's candidacy and the denial of his application for appointment. These issues are grounded on basic questions of law that the Court could resolve at this stage in the proceedings, or decide on a motion for summary judgment, or even defer until a trial.

On the repleading that the Court permitted, Kregler addressed these issues either in conclusory terms or with generalized allegations which still require substantial inferential leaps, rather than with factual assertions which more directly support his claim. *See Iqbal,* 490 F.3d at 158 (expressing concern that "allowing some of the Plaintiff's claims to survive a motion to dismiss might facilitate the very type of broad-ranging discovery and litigation burdens that the qualified immunity privilege was intended to prevent"). If the Court were to deny Defendants' motion because Kregler has amended the pleadings to add enough generalized or conclusory statements suggesting Defendants' personal involvement in the alleged adverse action and a causal connection between it and Kregler's projected speech, so as to barely survive dismissal at this point, this would send the case into further litigation proceedings likely to entail broad-ranging discovery against the City and the five officials. Typically, those proceedings would include interrogatories, requests to admit, depositions, affidavits, and production of correspondence and other documents. Almost predictably in these types of cases, the discovery would culminate— many months, or even years from now, and at a financial cost of tens if not hundreds of thousands of dollars—in a motion for summary judgment that in all

probability would turn on resolution the same threshold issues pivotal to any decision on the motion at hand.

Much of this litigation potentially could be avoided by means of a preliminary hearing at this juncture. At that proceeding the Court can hear oral testimony and consider other evidentiary material addressing discrete threshold questions that may resolve the sufficiency of Kregler's retaliation claim, as well as the reasonableness of the inquiry Kregler made upon which he represented in his pleadings that his factual allegations have or will likely have evidentiary support. As appropriate, the Court may sustain the claim as plausible, order further limited discovery, or dismiss the action. At a conference with the parties, the Court will discuss the structure and scope of the hearing and resolve any procedural issues that may arise. At minimum, the Court contemplates the appearance of some of the parties to address limited and targeted questions pertaining to the threshold issues described above.

Admittedly, the approach the Court proposes here entails passage through relatively unchartered ground. Difficulties are bound to arise along the way. At this point some of the bumps and detours are entirely unknown, while others, though likely in the repertory of anticipated legal argument, do not appear insurmountable. But such challenges go with the territory in any form of exploration for new paths and different ways of doing things.

### IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the parties are directed to appear at a conference with the Court on March 27, 2009 at 2:00 p.m. to review preparation for a preliminary hearing pursuant to Federal Rule of Civil Procedure 12(i) concerning the matters described in the preceding discussion.

**SO ORDERED.**